RECEIVED
IN MONROE, LA
AUG 2 6 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **WESLEY HARRIS** | **CIVIL ACTION NO. 04-0542** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **GRAMBLING STATE UNIVERSITY** | **MAG. JUDGE JAMES D. KIRK** |

## RULING

This lawsuit was brought by Plaintiff Wesley Harris against Grambling State University ("GSU")[1] on the basis of its alleged discriminatory refusal to hire him as assistant police chief. Harris, a white male, contends that GSU violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, when it refused to hire him on the basis of his race. Harris further contends that GSU's actions constitute intentional infliction of emotional distress under state law.

On June 24, 2005, GSU filed a Motion for Dismissal and Summary Judgment [Doc. No. 18], alleging that all Tureaud's claims fail as a matter of law. After an extension of time, Tureaud filed his Opposition to Motion for Dismissal and Summary Judgment on July 29, 2005.

For the following reasons, GSU's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

---

[1] Grambling State University is operated through the Louisiana Board of Trustees for Colleges and Universities.

I.   **Facts and Background**[2]

GSU is an historically black university located in Grambling, Louisiana. In October 2002, GSU hired Rodney Tureaud as its police chief. Although Tureaud had never worked with a university police department, he had more than twenty years of law enforcement experience with U.S. Customs Service. As chief, Tureaud was responsible for the entire department, including the management of the office, officer training, law enforcement, and the interactions of the department with all facets of the university and the public. Tureaud described GSU as being in a state of "disarray" at the time he was hired.

As early as fall 2002, Harris met with Tureaud regarding an assistant police chief position and submitted a resume and copy of a State Civil Service application. At the time of this first meeting, the assistant police chief position did not exist. However, in 2003, Tureaud sought and obtained approval from GSU to create the position of assistant police chief. This position was to be unclassified, such that any person hired was not subject to the state civil service rules, but was employed at the will of GSU. Other than the position of chief, all positions in the police department were classified and subject to the state civil service rules.

After the creation of the assistant police chief position was approved, Turead began recruiting personnel to fill that position and two classified sergeant positions. Although GSU's handbook for

---

[2]Some of the facts are taken from depositions provided in the companion case of *Tureaud v. Grambling State Univ.*, Civil Action No. 03-2253, Western District of Louisiana, Monroe Division. *See Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) ("Sworn deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding. . . . Such testimony is considered to be an affidavit pursuant to Federal Rule of Civil Procedure 56(c), and may be used against a party on summary judgment as long as the proffered depositions were made on personal knowledge and set forth facts that were admissible in evidence.") (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991)).

unclassified employees required a search committee to be appointed for any unclassified administrative positions, Tureaud sought to fill the assistant police chief position himself. On or about February 28, 2003, Harris submitted an application for the position. Tureaud also received three other applications. Of the three, Tureaud determined that one of the applicants was not qualified because of his previous work record with GSU[3] and that two of the applicants, both black males, should be interviewed for the available sergeant positions instead. Tureaud selected Harris for assistant police chief. Harris was interviewed by two or three persons not employed by GSU, but no GSU employee other than Tureaud ever interviewed Harris. Harris also had some informal meetings with GSU personnel at Tureaud's office.

In a May 13, 2003 memorandum, Tureaud recommended to Vice-President of Student Affairs Dr. Ruby Higgins ("Higgins") that Harris be hired as assistant police chief and that the other two applicants, Rodney Jones ("Jones") and Greg Clement ("Clement"), be hired as sergeants. Higgins agreed to process the paperwork recommending the hiring of the two black applicants, Jones and Clement, for the classified sergeant positions, but refused to process the personnel action form for the hiring of Harris. Higgins explained that Harris's form was not completed properly because he was not permitted to sign the form before anyone else at GSU. However, when Tureaud re-submitted the form without Harris's signature, Higgins still refused to process it.

The human resources department was responsible for verifying that all hiring procedures were followed for classified positions. Higgins was responsible for ensuring that the hiring procedures were followed for unclassified positions. Higgins has testified that she determined

---

[3]According to Tureaud, he discussed the four applicants with Dr. Ruby Higgins, Executive Vice President of Student Affairs, and she brought to his attention that one of the applicants had previously been employed by GSU and was not a good candidate for the position.

3

Tureaud had not followed the proper procedures in the selection of Harris as assistant police chief because no search committee had been formed. According to Tureaud, Higgins never told him that he failed to follow proper procedures, other than her statement that Harris's signature could not be on the payroll action form when it was submitted for processing.

The human resources department later allegedly determined that Tureaud had not followed Civil Service rules in the selection of Clement and Jones for the sergeant positions.

On May 15, 2003, Harris was informed that his personnel action form would not be processed. Tureaud told Harris that he had met with extreme resistance from GSU officials in hiring Harris because of Harris's race. Tureaud has testified in his own case that, prior to his termination, he spoke with several people, both on- and off-campus as to what he might do to persuade Higgins to process Harris's application. The then-President Neari Warner ("Warner") referred him back to Higgins. He also had a conversation with Dr. Angela Weaver ("Weaver"), the Executive Assistant to the President of GSU. Weaver (who sat right outside the President's Office), expressed dissatisfaction with Tureaud's attempt to hire Harris because Harris was formerly employed by the Ruston Police Department. She expressed her view that the Ruston Police Department was "racist" and said that GSU students had issues or problems with the department. According to Tureaud, she asked why Tureaud could not just hire a black applicant and train him for the position. Tureaud explained that he needed Harris because of his experience.

Effective June 3, 2003, Tureaud was terminated by GSU. He filed a charge of discrimination with the EEOC. A notice of right to sue issued, and Tureaud timely filed a lawsuit against GSU on December 9, 2003, alleging that he had been terminated for attempting to hire Harris as an assistant police chief. GSU filed a motion for summary judgment in Tureaud's case. The Court will issue

a Ruling on that motion contemporaneously with the present Ruling.

Harris also filed a charge of discrimination with the EEOC, received a notice of right to sue, and timely filed this lawsuit against GSU.

GSU has never filled the two sergeant positions or the assistant police chief position.

## II. Law and Analysis

### A. Motions for Summary Judgment[4]

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. *Ashe v. Corley*, 992 F.2d 540,

---

[4]Although GSU's Memorandum is styled as being "In Support of Defendant's Motion for Summary Judgment," it cites the Court to the standard of review both for a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and for a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because the Court has considered evidence outside the pleadings, the appropriate standard of review is that for a summary judgment. *See* Fed. R. Civ. P. 12(c) (If "on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment.").

543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B. Discrimination Claim

Title VII prohibits an employer from failing or refusing to hire any person because of his race. *See* 42 U.S.C. § 2000e-2. To establish a claim of race discrimination under Title VII in the absence of direct evidence, the plaintiff may rely on the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The plaintiff must first establish a prima facie case by showing that (1) he is a member of a protected class, (2) he applied and was qualified for a job for which the employer was seeking applications, (3) despite his qualifications, he was rejected, and (4) after his rejection, the position remained open, and the employer continued to seek applications. *See id.* at 802.

Once a plaintiff's prima facie burden is met,

> the defendant then must articulate a legitimate, non-discriminatory reason for its [adverse employment decision]; and, if the defendant meets its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).'" *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp.2d 854, 865 (M.D.N.C.2003).

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

GSU admits that Harris was a member of the white race and that he was qualified for the assistant police chief position. However, GSU contends that Harris cannot meet his prima facie burden because he cannot show that he was rejected and that GSU continued to seek applicants for the assistant police chief position. In support of its position, GSU argues that Tureaud, Higgins, and Harris all agree that the proper procedure for hiring unclassified employees was not followed and that GSU did not recruit and fill the position after Harris's alleged "rejection." GSU also states that Harris never received "a rejection letter . . . regarding his application."

In response, Harris argues that Tureaud received approval for the assistant police chief position and that, despite being the most qualified person for the position, GSU refused to allow him to continue through the approval process.

The Court finds that Harris has met his prima facie burden. While GSU admits that Harris was qualified for the assistant police chief position, its only reason for refusing to approve his hiring is Tureaud's failure to follow proper procedure. However, Harris applied for the assistant police chief position in 2003 and clearly remained interested in that position, but, to date, he has not been hired nor had his application processed, and GSU has continued to advertise the position. Neither Turead's procedural failures nor the fact that Harris did not receive a "rejection letter" prevents him from meeting his prima facie burden.

The burden of production shifts to GSU. GSU contends that Harris was not hired because the proper procedures were not followed. According to GSU, the appropriate formal interviews were not conducted, and the correct number of GSU personnel did not participate in the interview process. GSU has, at least minimally, met its burden of production.

However, Harris has raised a genuine issue of material fact for trial as to whether these reasons are pretext for discrimination. Tureaud has testified that he was never informed prior to his

7

termination that he had failed to follow proper hiring procedures. Instead, Higgins told him the payroll action form was improperly signed by Harris prior to submission. When the form was re-submitted, Higgins simply refused to sign it. Additionally, Tureaud solicited advice from both GSU personnel, including the then-President, and non-GSU persons in an attempt to get Harris hired. According to Tureaud, during this time he was never told by anyone at GSU that he needed to alter the hiring process he had implemented. Instead, the President's Executive Assistant told him that Harris was formerly employed by a "racist" police department and that he should hire and train a black applicant. Finally, the fact that GSU has not hired a non-white applicant to fill the assistant police chief position with this lawsuit pending hardly justifies summary judgment in this case.

Accordingly, GSU's Motion for Summary Judgment on Harris's claim of race discrimination in violation of Title VII is DENIED.

### C. Punitive Damages

The Court finds that GSU is correct that a governmental entity or political subdivision is not subject to punitive damages under Title VII. Title 42, Section 1981a(b)(1) provides as follows:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, governmental agency or political subdivision) if the complaining party demonstrates the respondent engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference.

Accordingly, Harris's claim for punitive damages under Title VII is DISMISSED WITH PREJUDICE.

### D. Intentional Infliction of Emotional Distress Claim

GSU has also moved for summary judgment on Harris's intentional infliction of emotional distress claim, contending that it has not waived its Eleventh Amendment immunity on this claim. Harris has not opposed summary judgment on this claim.

8

The Court agrees that GSU appears to have a strong argument that it is entitled to immunity from suit in federal court. However, the Court need not reach GSU's immunity argument because it finds that, under the standard set forth in *White v. Monsanto*, 585 So.2d 1205 (La. 1991), Harris's allegations fails to state a claim for intentional infliction of emotional distress. As the Louisiana Supreme Court has explained, this cause of action is available if plaintiff can show (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Id.* at 1209-10 (internal citations omitted). The mere fact that Harris was discriminated against is not sufficient to constitute the type of outrageous conduct required for a finding of liability. *See, e.g., Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1144 (5th Cir. 1991) ("We agree . . . that more is required to prove intentional infliction of emotional distress than the usual ADEA claim.") (quoting *Dean v. Ford Motor Co.*, 885 F.2d 300 (5th Cir. 1989)).

Accordingly, GSU's Motion for Summary Judgment on Harris's intentional infliction of emotional distress claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### III. Conclusion

For the foregoing reasons, GSU's Motion for Summary Judgment [Doc. No. 18] is GRANTED IN PART AND DENIED IN PART. As to Plaintiff's claim of intentional infliction of emotional distress under state law and his claim for punitive damages under Title VII, Defendant's Motion for Dismissal and Summary Judgment is GRANTED, and these claims are DISMISSED WITH PREJUDICE. As to Plaintiff's claim of race discrimination in violation of Title VII,

Defendant's Motion for Dismissal and Summary Judgment is DENIED.

MONROE, LOUISIANA, this 26 day of August, 2005.

*Robert G. James*
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE